**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ILLINOIS COMMERCIAL FISHING ASSOCIATION,**<br><br>　　Plaintiff,<br><br>　　v.<br><br>**KEN SALAZAR, in his official capacity as Secretary of the United States Department of the Interior, and U.S. FISH AND WILDLIFE SERVICE,**<br><br>　　Defendants. | Civil Action No. 10-1642 (JEB) |

## MEMORANDUM OPINION

The pallid sturgeon (*Scaphirhynchus albus*) is an endangered fish species that inhabits the Missouri and Mississippi river basins. It closely resembles the shovelnose sturgeon (*Scaphyrhynchus platorynchus*), a more common fish that is not at risk of becoming endangered. In 2010, the U.S. Fish and Wildlife Service issued a rule under the "similarity of appearance" provisions of the Endangered Species Act, requiring the shovelnose sturgeon to be treated as a "threatened" species in the geographic range where it coexists with the pallid sturgeon. Commercial fishermen are accordingly prohibited from harming or killing shovelnose sturgeon in those areas.

Unhappy with such a restriction on its members' ability to catch shovelnose sturgeon, the Illinois Commercial Fishing Association, on behalf its membership and all similarly situated individuals, filed this suit seeking to set aside the rule. The parties have now filed Cross-Motions for Summary Judgment. Because the rule complies with the requirements of the

Endangered Species Act and is adequately supported by the administrative record, the Court will grant Defendants' Motion and deny Plaintiff's.

## I. Background

### A. Statutory Background

The Endangered Species Act, 16 U.S.C. §§ 1531-44, was enacted in 1973 "to provide a means whereby ecosystems upon which endangered species and threatened species depend may be conserved" and "to provide a program for the conservation of such endangered species and threatened species …." 16 U.S.C. § 1531(b). Its passage marks Congress's commitment "to halt and reverse the trend toward species extinction, whatever the cost." Tenn. Valley Auth. v. Hill, 437 U.S. 153, 184 (1978).

Section 4 of the Act directs the Secretary of the Interior or the Secretary of Commerce (depending on the species) to determine which species should be listed as "endangered" or "threatened." 16 U.S.C. § 1533(a)(1). A species is to be classified as "endangered" if it is "in danger of extinction throughout all or a significant portion of its range …." § 1532(6). If the species "is likely to become … endangered … within the foreseeable future throughout all or a significant portion of its range," the Secretary should list it as "threatened." § 1532(20).

Endangered species are entitled to a number of legal protections under the Act, including a prohibition on "take." See §§ 1538(a)(1)(B)-(C). The Act defines to "take" as to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" any endangered species or to "attempt to engage in any such conduct." § 1532(19); see also Babbitt v. Sweet Home Chapter of Communities for a Great Or., 515 U.S. 687, 704 (1995) (ESA defines "take" in "the broadest possible manner to include every conceivable way in which a person can 'take' or attempt to 'take' any fish or wildlife").

When a species is listed as "threatened," the Act directs the Secretary to "issue such regulations as he deems necessary and advisable to provide for the conservation of such species." §1533(d). Under this provision, he is authorized to extend any prohibition that applies to endangered species to any "threatened" species of fish or wildlife. Id.; see also § 1538(a)(1). The Secretary of the Interior has promulgated a general regulation stating that, in the absence of species-specific regulations, the prohibitions with respect to endangered wildlife shall apply to all "threatened" wildlife within its jurisdiction. See 50 C.F.R. § 17.31(a). If, however, the Secretary elects to create a special rule governing a particular threatened species, "all the applicable prohibitions and exceptions" must be contained therein, as the general regulation will not apply. See 50 C.F.R. § 17.31(c).

Even if the Secretary determines after considering the relevant factors that a particular species is neither threatened nor endangered, see 16 U.S.C. §§ 1533(a)(1)(A)-(E), he may nonetheless treat it as such based on its similarity of appearance to a listed species. See § 1533(e). Specifically, Section 4(e) of the ESA authorizes the Secretary to treat any species as an endangered species or threatened species if he finds that:

> (A) such species so closely resembles in appearance, at the point in question, a species which has been listed pursuant to such section that enforcement personnel would have substantial difficulty in attempting to differentiate between the listed and unlisted species;
>
> (B) the effect of this substantial difficulty is an additional threat to an endangered or threatened species; and
>
> (C) such treatment of an unlisted species will substantially facilitate the enforcement and further the policy of this chapter.

Id.; see also 50 C.F.R. § 17.50(b) (regulatory interpretation of 16 U.S.C. §§ 1533(e)(A)-(C)). If the Secretary wishes to afford a species special protections and these three criteria are satisfied, the species must "appear in the list in [50 C.F.R.] § 17.11" with an indication of whether it is to be treated as threatened or endangered. See 50 C.F.R. § 17.50(a).

B. Factual Background

The pallid sturgeon is a ray-finned, spade-snouted freshwater fish that now resides exclusively in the Missouri and Mississippi river basins, having been extirpated from most if its historical range. See Endangered and Threatened Wildlife and Plants; Threatened Status for Shovelnose Sturgeon under the Similarity of Appearance Provisions of the Endangered Species Act, 75 Fed. Reg. 53,598 (Sep. 1, 2010); AR 2618-26. It can grow to five feet in length and weigh up to 80 pounds. See AR at 24. Because its ancestors date back 78 million years, it is sometimes referred to as a "living dinosaur." Id.

Due to habitat alteration and commercial harvesting, the pallid sturgeon is now in danger of extinction. See Endangered and Threatened Wildlife and Plants; Determination of Endangered Status of the Pallid Sturgeon, 55 Fed. Reg. 36,641 (Sep. 6, 1990); AR 2630-36. In 1990, the U.S. Fish and Wildlife Service (FWS) named it an endangered species, making it unlawful to kill or otherwise harm a member of the species. See id.; see also 16 U.S.C. §§ 1538(a)(1)(B)-(C), 1532(19).

The pallid sturgeon is closely related to the shovelnose sturgeon, a similar looking but more prevalent species whose habitat overlaps with the pallid sturgeon in certain areas. See 75 Fed. Reg. 53,598 (AR 2618). Although the shovelnose sturgeon is not itself on the verge of becoming endangered or extinct, FWS has designated it – along with its close relative, the shovelnose-pallid sturgeon hybrid – as a "threatened" species because of its similarity of appearance with the endangered pallid sturgeon. See 75 Fed. Reg. 53598-53605 (Sep. 1, 2010);

50 C.F.R. § 17.44(aa)(1). This designation applies only to those geographic areas where shovelnose and pallid sturgeon cohabitate, which constitutes only a portion of the shovelnose sturgeon's area of habitation. See id. at §§ 17.44(aa)(1)-(2); see also 75 Fed. Reg. 53,598, 53604-05 (AR 2618, 2624-25) (identifying geographic areas on a map); 75 Fed. Reg. 53,599 (AR 2619) ("[T]his rule covers the minimal geographic extent necessary to effectively conserve pallid sturgeon."). Thus, in areas where the two species live alongside one another, fisherman cannot "take" shovelnose sturgeon for commercial purposes. 50 C.F.R. § 17.44(aa)(1).

C. Procedural History

On September 29, 2010, the Illinois Commercial Fishing Association (ICFA) filed this suit challenging the rule that affords shovelnose sturgeon in the same geographic area as pallid sturgeon the protections of a "threatened" species. 75 Fed. Reg. 53,598 (Sep. 1, 2010). This Court originally dismissed Counts I through III without prejudice for failure to adequately allege standing, and it dismissed Count IV, which alleged Congressional Review Act violations, with prejudice. See Mem. Op. of June 16, 2011.

On June 30, 2011, Plaintiff filed a Second Amended Complaint against Kenneth Salazar, in his official capacity as Secretary of the United States Department of Interior, and FWS, which is the agency within the Department of Interior responsible for administering the ESA for species within the Department's jurisdiction. The Complaint alleges violations of the ESA, 16 U.S.C. §§ 1531-44 (Count I), the National Environmental Policy Act, 42 U.S.C. §§ 4321-47 (Count II), the Regulatory Flexibility Act, 5 U.S.C. §§ 601-12 (Count III), and the Administrative Procedures Act, 5 U.S.C. §§ 701-06. See Second Amended Complaint, ¶ 3. Plaintiff moved for summary judgment on all claims on February 2, 2012, and Defendants cross-moved for summary judgment on March 5. Plaintiff has since expressly conceded their RFA and NEPA claims, see

Pl. Reply & Opp. at 11, so only the claims arising under the APA and ESA are now before the Court.

## II.    Legal Standard

Although styled Motions for Summary Judgment, the pleadings in this case more accurately seek the Court's review of an administrative decision. The standard set forth in Rule 56(c), therefore, does not apply because of the limited role of a court in reviewing the administrative record. See Sierra Club v. Mainella, 459 F. Supp. 2d 76, 89-90 (D.D.C. 2006) (citing National Wilderness Inst. v. United States Army Corps of Eng'rs, 2005 WL 691775, at *7 (D.D.C. 2005); Fund for Animals v. Babbitt, 903 F. Supp. 96, 105 (D.D.C. 1995), amended on other grounds, 967 F. Supp. 6 (D.D.C. 1997)). "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." Id. at 90 (internal citations omitted). Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review. See Richards v. INS, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977), cited in Bloch v. Powell, 227 F. Supp. 2d 25, 31 (D.D.C. 2002), aff'd, 348 F.3d 1060 (D.C. Cir. 2003).

Courts review agency decisions under the ESA according to the APA. See Am. Wildlands v. Norton, 193 F. Supp. 2d 244, 251 (D.D.C. 2002) (citing City of Las Vegas v. Lujan, 892 F.2d 927, 932 (D.C. Cir. 1989)). The APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness …." FCC v. Fox Television Stations, Inc., 129 S. Ct. 1800, 1810 (2009). It requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This is a "narrow"

standard of review as courts defer to the agency's expertise. <u>Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983). An agency is required to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." <u>Id.</u> (internal quotation omitted). The reviewing court "is not to substitute its judgment for that of the agency," <u>id.</u>, and thus "may not supply a reasoned basis for the agency's action that the agency itself has not given." <u>Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.</u>, 419 U.S. 281, 285-86 (1974) (internal quotation omitted). Nevertheless, a decision that is not fully explained may be upheld "if the agency's path may reasonably be discerned." <u>Id.</u> at 286.

**III.     Analysis**

Plaintiff attacks FWS's decision to classify the shovelnose sturgeon as threatened as a violation of the ESA. It also brings assorted other APA-related challenges to the rule. The Court will first address the ESA and its three similarity-of-appearance criteria, following which it will briefly deal with Plaintiff's remaining arguments.

A.   <u>Violation of ESA</u>

The key question before the Court is whether Plaintiff has demonstrated that the rule requiring shovelnose sturgeon to be treated as a threatened species in the Missouri and Mississippi river basins is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 706(2)(A), (C); <u>see also</u> <u>City of Olmsted Falls, Ohio v. FAA</u>, 292 F.3d 261, 271 (D.C. Cir. 2002). In making this determination, the Court will consider whether the administrative record supports Defendants' finding that the three requirements of the ESA's "similarity of appearance" provision have been met here. <u>See</u> 16 U.S.C. § 1533(e). The Court is mindful of the fact that, in rulemakings such as this one, the threshold for surviving

judicial review is a low one. Where, as here, the agency's technical expertise is involved, the Court "must look at the decision not as the chemist, biologist, or statistician that [it is] qualified neither by training nor experience to be, but as a reviewing court exercising [its] narrowly defined duty of holding agencies to certain minimal standards of rationality." Ethyl Corp. v. EPA, 541 F.2d 1, 36 (D.C. Cir. 1976) (*en banc*).

1. *Close Resemblance and Substantial Difficulty*

To afford a species special protection because it looks like an imperiled species, the Secretary must first find that it "so closely resembles" a threatened or endangered species "that enforcement personnel would have substantial difficulty in attempting to differentiate between the listed and unlisted species …." 16 U.S.C. § 1533(e)(A); see also 50 C.F.R. § 17.50(b). Defendants point to a wide range of evidence in the administrative record that shovelnose sturgeon satisfy this criterion.

First, fish biologists and commercial fishermen – both of whom have more specialized knowledge of fish species than enforcement personnel – have trouble distinguishing between the shovelnose sturgeon and pallid sturgeon. See 75 Fed. Reg. 53,599 (AR 2619) (noting that fish biologists must rely on one or both anatomical indices developed to help identify whether a caught specimen is a shovelnose sturgeon, a pallid sturgeon, or a hybrid); AR 18 (state agency's view that commercial fishermen's ability to differentiate between shovelnose and pallid sturgeon needs improvement); AR 530 ("[t]rained biologists can have a difficult time distinguishing between shovelnose and pallid sturgeon with intermediate physical characteristics," according to a federal/state intergovernmental wildlife cooperative association); AR 1835 (statement by U.S. Army Corps of Engineers official that "pallid sturgeon and shovelnose sturgeon can be difficult to distinguish by commercial fishermen").

Even the indices developed by scientists sometimes lead to inaccurate identifications. See 75 Fed. Reg. 53,599 (AR 2619) (citing AR 3186-87, 3232) (study concluding that some sturgeon that appeared intermediate in character based on two scientific indices were, in fact, genetically identified as pallid sturgeon); AR 35 ("Character indices developed by taxonomists can be complex and are not always accurate."); AR 2682 ("character indices such as the CI of Wills *et al*. (2002) are incapable of definitively identifying pallid sturgeon in the field, especially in the lower Mississippi River").

If trained fish biologists struggle to distinguish between the shovelnose and pallid sturgeon – even when aided by scientific tools designed specifically for that purpose – it is certainly reasonable to infer that enforcement personnel will have at least as much (and probably more) trouble doing so.  Unlike fish biologists and commercial fishermen, the agents who enforce the ESA do not focus on fish, let alone a particular species of fish.  Rather, they are responsible for enforcing ESA protections for all listed species within their jurisdiction, from plants and birds to reptiles and mammals.  See U.S. Fish and Wildlife Service, Office of Law Enforcement, About Service Law Enforcement, available at http://www.fws.gov/le/AboutLE/about_le.htm (last visited June 8, 2012).  On top of that, they enforce other federal wildlife-protection statutes that cover their geographic area. Id.  Given the breadth of their law-enforcement responsibilities and the challenges that even trained specialists encounter in attempting to differentiate between the shovelnose and pallid sturgeon, it is certainly reasonable to assume that the FWS's enforcement personnel would have "substantial difficulty" distinguishing between the species.

The Court need not rely on the reasonableness of this inference, however.  The Service's law-enforcement personnel have themselves acknowledged how hard it is to differentiate the two

species. In fact, they identified "the difficulty in distinguishing pallid from shovelnose sturgeon" as one of the two greatest challenges of their job (with the other being the variations in regulations from state to state). AR 1101; see also AR 1835 (statement by U.S. Army Corps of Engineers that commercial fishermen, scientists, and law enforcement find it difficult to distinguish between the pallid and shovelnose sturgeon).

If that were not enough, three independent peer reviewers agreed that the first criterion was satisfied based on the evidence in the record. See AR 1786; see also AR 1783, 1788. Timothy Spier of the Department of Biological Sciences at Western Illinois University stated that "law enforcement would have substantial difficulty differentiating between the shovelnose and pallid," noting that "even commercial fishers, who have much more experience with these fish than most law enforcement officials, had difficulty identifying pallids." AR 1786 (citing Bettoli *et al*. study). Another peer reviewer, highlighting the genetic similarity between the two species, indicated that there would be no way to equip law-enforcement officials with the morphometric or genetic tools necessary to distinguish them. AR 1783. The third reviewer focused on the challenges of identifying the species' roe, writing that "[t]he studies cited in the proposed rule make it abundantly clear that law enforcement personnel would have great difficulty in differentiating between shovelnose sturgeon and endangered pallid eggs." AR 1783.

Plaintiff combats this wealth of evidence by arguing that "all of the record documents used by the federal defendants concerning laboratory studies, fish biologists, and the peer reviews are a red herring." Pl. Reply & Opp. at 7. Specifically, it contends that these documents are "not relevant to the legal issue" because the ESA requires that enforcement personnel have substantial difficulty differentiating between the two species, and the aforementioned data relates only to others' ability to do so. Id.; see also id. at 8. While Plaintiff

acknowledges that Defendants offered some direct evidence from enforcement personnel, it maintains that it is but a small portion of the whole administrative record and, as such, is insufficient to withstand judicial review.

As explained above, the evidence that fishermen and fish biologists have trouble distinguishing between the species is relevant because it shows that even people with greater familiarity and expertise than the enforcement personnel cannot always tell the difference between shovelnose and pallid sturgeon. This data, together with statements from law enforcement personnel, is more than adequate to meet the APA's very deferential standard.

### 2. *Additional Threat*

The second criterion for listing a species as threatened or endangered under the similarity-of-appearance provision is that enforcement personnel's "substantial difficulty" poses an additional threat to an endangered or threatened species. See 16 U.S.C. § 1533(e)(B). This requirement is met here because the evidence in the record demonstrates that (1) take of pallid sturgeon incident to commercial shovelnose-sturgeon fishing is a threat to the pallid sturgeon, and (2) the inability to effectively enforce the ban on taking pallid sturgeon allows fishermen to take the endangered fish with impunity, rendering the ban futile. Although Plaintiff does not dispute the evidence on either point – focusing instead on its previously rejected argument that law enforcement does not have substantial difficulty distinguishing between the species – the Court will nonetheless review the record.

Since the pallid sturgeon was originally listed as endangered in 1990, FWS has identified commercial shovelnose-sturgeon fishing in the areas where pallid sturgeon exist as a threat to the species. See 55 Fed. Reg. 36,641 (AR 2630); AR 3464-66, 3476 (confirming continuing threat from commercial shovelnose-sturgeon fishing in Service's most recent 5-Year Review).

Scientific studies support this finding. For example, published research shows that the "mortality associated with commercial fishing activity is likely substantially lowering recruitment, negatively impacting population growth, and ultimately affecting recovery" of the pallid sturgeon species. 75 Fed. Reg. 53,602 (AR 2622) (citing Columbo *et al.* 2007 (AR 92), Keenlyne and Jenkins 1993 (AR 2976)).

In addition, because of the difficulty of distinguishing between the shovelnose and pallid sturgeon, enforcement personnel are unable to adequately enforce the prohibition on take of the endangered fish. The Service's Resident Agent-in-Charge for Illinois, Indiana, and Missouri has stated that there is "little [they] can do" to protect the pallid sturgeon while commercial fishing of the shovelnose is permitted. AR 6. He accordingly requested that the Service ban take of shovelnose under Section 4(e) of the ESA to close the "loophole" created by the two species' similar appearance. See id.; see also AR 1838 (request by U.S. Army Corps of Engineers for the shovelnose to be listed under ESA's look-alike provision in order to ameliorate problems with enforcing the prohibition on take of pallid sturgeon). Treating the shovelnose as a threatened species would not only facilitate law enforcement's ability to determine when a fish has been unlawfully taken, but it would also prevent poachers from claiming that they innocently mistook a pallid sturgeon for a shovelnose. See AR 11, 306.

The challenges of enforcing the ban are even greater when fishermen harvest eggs from the fish, as their roe is largely indistinguishable. Not only are Conservation Agents unable to identify the species of the egg, see AR 8, but even genetic tests are unable to differentiate the two species' roe. See AR 2742. It is thus extraordinarily difficult for enforcement personnel to combat the illegal trade in pallid sturgeon roe without take prohibitions on both the pallid and shovelnose sturgeon. See 75 Fed. Reg. 53,602 (AR 2622). And, indeed, the roe – for sale as

caviar – is one of the principal incentives to take the fish in the first place. See AR 1838 (report of U.S. Army Corps of Engineers official observing "[w]anton waste of sturgeon carcasses, both pallid and shovelnose … with immature females and misidentified males being discarded in dumpsters upon producing no roe"). As a result, some commercial fishermen simply slit the bellies of both fish in search of roe and then toss the fish back into the water. See id.; see also AR 468 (photograph of living pallid sturgeon with "check mark" scar from having been cut in the abdomen by commercial fishermen checking for roe); AR 35 (noting that the federal/state intergovernmental Pallid Sturgeon Recovery Team had captured "female pallid sturgeon with [egg] check marks").

The similarity of appearance between the shovelnose and the pallid sturgeon makes it nearly impossible to enforce the prohibition on take of the pallid sturgeon. And a ban without bite is ineffective at best (especially when the financial incentives to violate the ban are significant). See AR 8. The Service's finding that the difficulty of distinguishing between the pallid and shovelnose sturgeon poses an additional threat to the former, therefore, easily crosses the hurdle to survive judicial review here.

### 3. *Facilitate Enforcement*

The third and final requirement for treating a species as threatened or endangered because of its resemblance to a species facing extinction (or endangerment) is that "such treatment … [must] substantially facilitate the enforcement and further the policy of this chapter" of the ESA. 16 U.S.C. § 1533(e)(C). The stated policy of the chapter is that "all Federal departments and agencies shall seek to conserve endangered species and threatened species" and use their authorities toward this end. 16 U.S.C. § 1531(c)(1); see also 16 U.S.C. §§ 1531 (a), (b),

1533(e)(C) (policy of ESA is to prevent extinction of imperiled animal and plant species, and further their recovery).

As discussed in Section III.A.2, *supra*, a prohibition on the take of shovelnose sturgeon substantially advances law-enforcement efforts to protect the pallid sturgeon. It eliminates the difficult law-enforcement task of attempting to distinguish between the species. In addition, it facilitates prosecution of poachers who might otherwise be able to avoid punishment by arguing that they reasonably believed they had lawfully taken a shovelnose sturgeon.

Listing the shovelnose as a threatened species under the similarity-of-appearance provision also furthers the ESA's goal of conserving the endangered pallid sturgeon. Scientific studies indicate that pallid sturgeon are, in fact, being taken by shovelnose fisherman in areas that both species inhabit. For instance, scientists have observed a large difference in the mortality rates and maximum ages of pallid sturgeon in areas with commercial shovelnose harvest compared to those without. See AR 70 (observed mortality rate of 37-39% in areas with commercial shovelnose-sturgeon harvest compared to 12% mortality rate in areas without); see also AR 2982-84 (study finding difference in age classes between areas with commercial shovelnose harvest and without); AR 93 (published study noting that "current recovery efforts underway for the endangered pallid sturgeon may be jeopardized" by commercial shovelnose fishing); AR 3030 (study stating that "[i]ncidental and illegal harvest of pallid sturgeon has been documented in the Mississippi River, and this may be a significant impediment to survival and recovery of the species in some portions of its range") (internal citations omitted).

Another study revealed that a minimum of 1.8% of all sturgeon harvested in Tennessee's shovelnose fishery during five observation days were pallid sturgeon. See AR 2679 ("Two of the 113 harvested sturgeon were confirmed pallid sturgeon based on microsatellite DNA

analyses."); see also AR 281, 2681. Extrapolating this percentage of incidental pallid take over the previous two commercial fishing seasons, researchers estimate that at least 169 pallid sturgeon were illegally taken in the Tennessee waters of the Mississippi River between 2005 and 2007. See AR 2681 (basing estimate on reported harvest of 9371 shovelnose sturgeon in that area during that period). This study – like the studies discussed above – likely underestimates the take of pallid sturgeon by commercial shovelnose-sturgeon fisherman because of several sources of illegal take that cannot be documented by researchers – *e.g.*, pallid sturgeon killed in fishing nets that are never found, pallid sturgeon that die due to handling stress after being released, and pallid sturgeon who are cut by fishermen seeking eggs to harvest. See AR 315.

Plaintiff attempts to dismiss the Tennessee study by arguing that a 1.8% error rate can hardly be evidence of "substantial difficulty" in distinguishing between the two species; on the contrary, they argue, it shows that fishermen correctly identified the species over 98% of the time. See Pl. Mot. & Opp. at 12, 20-21. Plaintiff misunderstands (or mischaracterizes) the study's findings. The only error of concern to Defendants is one in which a fisherman incorrectly identifies a pallid sturgeon as a shovelnose sturgeon (and consequently takes the endangered fish). The 1.8% figure does not shed any light on how frequently fishermen made that mistake. In fact, the study showed that the fishermen misidentified 29% of the pallids they encountered – even though they "demonstrated exceptional knowledge regarding how to distinguish shovelnose sturgeon from pallid sturgeon and intermediate forms." See AR 271-72. See AR 2681 (Bettoli *et al*. study); 75 Fed. Reg. 53,602. This is hardly an insubstantial number, particularly when the survival of a species is on the line.

In any event, Defendants are not offering the finding that 1.8% of the sturgeon commercially harvested in Tennessee were pallid sturgeon to show the difficulty distinguishing

15

between the species. They are simply using the study to demonstrate that pallid sturgeon are being taken by commercial shovelnose-sturgeon fishermen. See Pl. Mot. & Opp. at 23.

The independent peer reviewers unanimously agreed with Defendants, finding that the third prong of ESA's look-alike provision was satisfied based on the scientific evidence in the record. See AR 1784-1788. One reviewer stated that listing the shovelnose sturgeon as a threatened species "will almost certainly facilitate enforcement of the [E]ndangered [S]pecies [A]ct," AR 1784, and another stated he believed doing so would "be the best way to protect and conserve pallid sturgeon." AR 1787. Defendants are therefore eminently reasonable in concluding that prohibiting take of both species would increase the efficacy of law-enforcement efforts and correspondingly reduce the mortality of pallid sturgeon. See Pl. Mot. & Opp. at 23.

Based on the abundance of evidence in the record, the Court finds that it was in no way arbitrary or capricious for Defendants to conclude that the three criteria in the similarity-of-appearance provision of the ESA had been met here.

B. Plaintiff's Remaining Contentions

Plaintiff, unsuccessful in its efforts to argue FWS did not comply with the ESA, offers several other points in support of its Motion. The Court will deal with the three in turn.

1. *Prohibition Limited to Commercial Fishing*

Plaintiff first contends that the rule prohibiting take of shovelnose sturgeon is arbitrary and capricious because it applies only to commercial fishing, not recreational fishing. See Pl. Mot. at 4-6, 9-11; 50 C.F.R. § 17.44(aa)(1) (prohibiting "take of any shovelnose sturgeon, shovelnose-pallid sturgeon hybrids, or their roe associated with or related to a commercial fishing activity"). If Defendants' intent in promulgating the rule were truly to protect the pallid sturgeon, Plaintiff submits, the rule would have banned take of shovelnose sturgeon by all fishermen, not commercial harvesters exclusively. See Pl. Mot. at 11. Plaintiff argues that by limiting the

prohibition to commercial fishing, Defendants revealed that the rule is merely a "pretext to halt commercial fishing." Id. at 5.

Contrary to Plaintiff's assertions, there is ample evidence in the record that the threat to the pallid sturgeon comes from commercial fishing as opposed to recreational fishing. A study published in a peer-reviewed journal found that while recreational fishing for shovelnose sturgeon does occur, it "is comparatively minor and likely not driven by market forces." AR 87 (Columbo et al. 2007); see also AR 2681 (published Bettoli et al. study observing that "pallid sturgeon were regularly encountering commercial gear"). This is consistent with a FWS biologist's statement that most states report that "there are few anglers that recreationally fish for shovelnose." AR 1026; see also AR 368 (Tennessee state biologist indicating he believes there are no recreational shovelnose sturgeon anglers in Tennessee). While specific data is not available for recreational fishers, commercial fishermen caught 23,075 pounds of shovelnose sturgeon flesh and 4,524 pounds of roe in the geographic areas at issue in the Final Rule during the most recent year for which data is available. See 75 Fed. Reg. 53,603 (AR 2623).

Commercial fishermen pose a greater risk to the pallid sturgeon's survival than do recreational fishermen not only because of the scale of their fishing, but also because their equipment is less targeted. Commercial harvesters often cast large nets that may be left unattended or lost, killing whatever fish they capture. See AR 271, 2679, 2681. Hoop nets and trammel nets, which are used by commercial sturgeon fishermen, are not selective in the species they capture. See AR 7. Because of this, commercial fishing methods are more likely to result in the death of non-targeted pallid sturgeon than the more selective methods used by recreational fishermen. Recreational fishermen also have no financial incentive to capture pallid sturgeon and thus are more likely to return a sturgeon they cannot identify rather than risk an illegal take.

See AR 1026; see also 16 U.S.C. § 1538(a)(1)(B) (take of pallid sturgeon remains unlawful for recreational fishermen).

The Court finds, accordingly, that Defendants' decision to limit the ban on take of shovelnose sturgeon to commercial fishing activity is reasonable and supported by the record.

### 2. *Overton Park*

Plaintiff also argues in its Opposition and Reply that the final rule is unlawful because, "just as in Overton Park, the administrative record is without relevant findings of fact by the Secretary of the Interior." Pl. Opp. & Reply at 5 (citing Citizens to Pres. Overton Park v. Volpe, 401 U.S. 402 (1971)). Contrary to Plaintiff's assertions, however, Overton Park does not stand for the proposition that the Secretary must issue formal findings of fact to support an agency rulemaking. In fact, the Supreme Court held that formal findings of fact were not required in that case. See Overton Park, 401 U.S. at 417 ("[R]eview of the Secretary's action is hampered by his failure to make such findings, but the absence of formal findings does not necessarily require that the case be remanded ….") In any event, FWS did make express findings here, explaining in detail why the requirements of Section 4(e) of the ESA had been met. See 75 Fed. Reg. 56,601-02 (AR 2621-2622). Plaintiff's argument is thus deficient.

Plaintiff also challenges the rule on the ground that "Secretary [Salazar] did not make an independent determination but merely relied on the judgment of the agency." Pl. Opp. & Reply at 6 (citing Overton Park, 401 U.S. at 407). Because Plaintiff did not make an improper-delegation claim in its Amended Complaint, the Court could disregard the argument on that basis. See Sharp v. Rosa Mexicano, D.C., LLC, 496 F. Supp. 2d 93, 97 n.3 (D.D.C. 2007). The Court nevertheless notes that the claim would fail on the merits. In Overton Park, the Secretary of Transportation relied on the recommendations of the Memphis City Council regarding the

placement of a public highway. See 401 U.S. at 407. Had the Supreme Court held that this was improper – which it did not – Overton Park would still be distinguishable because, unlike FWS, which is a component of the Department of Interior, the Memphis City Council is not one of the Department of Transportation's constituent agencies. It is well established that the Secretary of the Interior is authorized to delegate agency functions to other personnel within the agency, see 5 U.S.C. § 302, and he properly delegated implementation of the ESA to FWS over 30 years ago. See Def. Reply, Exh. A (U.S. Department of the Interior, Departmental Manual, § 242 DM 1.1(B) (1982)); Exh. B (U.S. Department of the Interior, Departmental Manual, § 206 DM 6).

### 3. *Chevron*

Finally, Plaintiff's contention that the agency is not entitled to Chevron deference is not apropos here as Plaintiff's claims do not turn on an agency's interpretation of a statute, but rather involves a straightforward application of Section 4(e) of the ESA to the facts in the record. See Pl. Mem. at 7 (citing Chevron U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837 (1984)).

### IV. Conclusion

For the foregoing reasons, the Court will issue a contemporaneous Order granting Defendants' Motion for Summary Judgment and denying Plaintiff's.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: June 12, 2012